IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH WASHINGTON, D-14198,<br><br>    Petitioner,<br><br>vs.<br><br>STU SHERMAN, Acting Warden,<br><br>    Respondent. | No. C 13-3438 CRB (PR)<br><br>ORDER GRANTING<br>MOTION TO DISMISS<br><br>(Dkt. #13) |

I.

Petitioner, a prisoner at the California Substance Abuse Treatment Facility and State Prison, Corcoran, seeks a writ of habeas corpus under 28 U.S.C. § 2254 invalidating a conviction from Santa Clara County Superior Court. Per order filed on February 25, 2014, the court noted that the petition appeared untimely and ordered respondent to either move to dismiss the petition on the ground that it is untimely or inform the court that respondent is of the opinion that a motion to dismiss is unwarranted in this case. Respondent filed a motion to dismiss the petition as untimely under 28 U.S.C. § 2244(d). Petitioner has filed an opposition and respondent has filed a reply.

II.

On October 3, 1994, petitioner was convicted by a jury in Santa Clara County Superior Court of two counts of first degree burglary. The jury also found that petitioner had nine prior "strike" convictions and, on March 3, 1995, the court sentenced him to a prison term of 60 years to life.

1  On October 29, 1996, the California Court of Appeal reversed one of the
burglary counts, affirmed the other and remanded the matter for re-sentencing.
On February 19, 1997, the Supreme Court of California denied review.

On April 25, 1997, the Santa Clara County Superior Court re-sentenced
petitioner to a prison term of 35 years to life and, on November 19, 1997, the
California Court of Appeal affirmed the judgment of the trial court. Petitioner
did not seek further direct review.

On or about November 26, 2002, petitioner filed a petition for a writ of
habeas corpus in Santa Clara County Superior Court. It was denied on January 8,
2003.

On July 24, 2003, petitioner filed a petition for a writ of habeas corpus in
the California Court of Appeal. It was denied on November 19, 2003.

On January 26, 2004, petitioner filed a petition for a writ of habeas corpus
in the Supreme Court of California. It was denied on July 21, 2004, with
citations to In re Clark, 5 Cal. 4th 750 (1993), and to In re Robbins, 18 Cal. 4th
770, 780 (1998).

On April 8, 2013, petitioner filed a petition for a writ of habeas corpus in
the Supreme Court of California. It was denied on June 12, 2013.

On July 25, 2013, petitioner filed the instant federal petition for a writ of
habeas corpus under 28 U.S.C. § 2254 claiming ineffective assistance of counsel.
Petitioner also claims to be "actually innocent."

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)
became law on April 24, 1996 and imposed for the first time a statute of
limitation on petitions for a writ of habeas corpus filed by state prisoners.
Petitions filed by prisoners challenging non-capital state convictions or sentences

1    must be filed within one year of the latest of the date on which: (1) the judgment
2    became final after the conclusion of direct review or the time passed for seeking
3    direct review; (2) an impediment to filing an application created by
4    unconstitutional state action was removed, if such action prevented petitioner
5    from filing; (3) the constitutional right asserted was recognized by the Supreme
6    Court, if the right was newly recognized by the Supreme Court and made
7    retroactive to cases on collateral review; or (4) the factual predicate of the claim
8    could have been discovered through the exercise of due diligence.  28 U.S.C.
9    § 2244(d)(1).  Time during which a properly filed application for state post-
10   conviction or other collateral review is pending is excluded from the one-year
11   time limit.  Id. § 2244(d)(2).

12          A state prisoner with a conviction finalized after April 24, 1996, ordinarily
13   must file his federal habeas petition within one year of the date his process of
14   direct review came to an end.  See Calderon v. United States Dist. Court (Beeler),
15   128 F.3d 1283, 1286 (9th Cir. 1997), overruled in part on other grounds by
16   Calderon v. United States Dist. Court (Kelly), 163 F.3d 530 (9th Cir. 1998) (en
17   banc).  If the prisoner could have sought review by the state court of appeal or the
18   state supreme court, but did not, the limitation period will begin running against
19   him the day after the date on which the time to seek such review expired.
20   Gonzalez v. Thaler, 132 S. Ct. 641, 653-54 (2012).

21          Here, the Santa Clara County Superior Court rendered its final judgment
22   on April 25, 1997 and the California Court of Appeal affirmed that judgment on
23   November 19, 1997.  But because petitioner did not seek review from the
24   Supreme Court of California, his conviction became final on December 29, 1997,
25   40 days after the California Court of Appeal affirmed the judgment of the
26   superior court.  See Cal. Rule of Court 8.366(b)(1) (California Court of Appeal

1
2
3
4
5
6
7
8
9
10
11
12

decision final 30 days after filing of decision); Cal. Rule of Court 8.500(e)(1) (petition for review in Supreme Court of California must be filed 10 days after California Court of Appeal decision finalized); accord Smith v. Duncan, 297 F.3d 809, 812-13 (9th Cir. 2002) (limitation period began running day after time to seek discretionary review of California Court of Appeal's decision in the Supreme Court of California expired, which was 40 days after California Court of Appeal filed its opinion).  Petitioner therefore had until December 29, 1998 to file a federal habeas petition within the one-year limitation period.  See Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001) (calculating AEDPA's one-year limitation period according to Federal Rule of Civil Procedure 6(a)).   But petitioner did not file the instant federal petition until July 25, 2013.  It is untimely unless the limitation period was tolled for a substantial period of time.

13
14
15
16
17
18
19
20
21
22
23

AEDPA's one-year limitation period is tolled under § 2244(d)(2) for the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2)).  But unfortunately for petitioner, he filed no petition for state post-conviction or collateral review to toll the one-year limitation period under § 2244(d)(2) before the limitation period expired on December 29, 1998.  The state habeas petitions he filed well after AEDPA's one-year statute of limitation ended cannot revive the limitation period.  See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("[S]ection 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed," even if the petition was timely filed under state rules).

### III.

25
26

Petitioner claims he is entitled to federal habeas review of his petition because he is "actually innocent."   A showing of actual innocence can provide a

27
28

4

gateway to federal habeas review of a petition filed after AEDPA's statute of limitation expired. See McQuiggin v. Perkins, 133 S. Ct. 1924, 1931- 32 (2013) (holding that actual innocence showing applies to claims filed after AEDPA statute of limitation has run, as well as to successive, abusive and procedurally defaulted claims); Lee v. Lampert, 653 F.3d 929, 931 (9th Cir. 2011) (en banc) (same). The actual innocence standard was "applied in Schlup v. Delo, 513 U.S. 298 (1995), and further explained in House v. Bell, 547 U.S. 518 (2006)." McQuiggin, 133 S. Ct. at 1928. It requires a petitioner to "produce sufficient proof of his actual innocence." Lee, 653 F.3d at 937. A petitioner must support his claim of actual innocence "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324. He must "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327.

In its inquiry, the reviewing habeas court "consider[s] all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." House, 547 U.S. at 538 (internal quotation marks omitted). And on this complete record, the court makes a "'probabilistic determination about what reasonable, properly-instructed jurors would do.'" Id. (quoting Schlup, 513 U.S. at 329).

"Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." McQuiggin, 133 S. Ct. at 1935. An eleventh hour affidavit from a fellow inmate, friend or relative of the accused has limited probative value in considering actual innocence. House, 547 U.S. at 552. In other words, new affidavits are not simply accepted at face value. Smith v. Baldwin, 510 F.3d 1127, 1142 (9th Cir. 2007) (en banc).

1  /

3    In the instant case, the California Court of Appeal summarized the
4 evidence presented at trial as follows:

> At 7:15 a.m. on April 15, 1994, Mildred Bradke was walking her dog in the park next to an apartment complex on Weddell Drive in Sunnyvale. She saw two people removing the window screen from apartment 26. One of them, a slender, light-skinned black person, wearing a red bandana, entered through the window. Bradke shouted to the man who remained outside. The man identified himself as "Newsome" and said he lived in the apartment and his wife had to go through the window because they had locked themselves out. Thereafter, the man entered through the door.
>
> Bradke knew that Linda Auble lived in apartment 26 and a black woman named Newsome lived in apartment 24. She confirmed this by checking the building's directory. She then left a note in the manager's mailbox, reporting what she had seen and describing the man as a "heavy Black man" and the other person as a "slim person in green slacks."[FN2]
>
>> [FN2]At trial, Bradke was unable to identify defendant from a photo layout. She later testified that one of the photos was similar to defendant. She also testified that defendant was similar to the man who entered the apartment. She later told Detective Mark B. Sole that she could not identify defendant as the man she saw and said she did not believe he was the man.
>
> The apartment manager Luis Villasenor found the note and at 8:30 a.m. checked apartment 26. The screen was in place, and nothing seemed wrong. He attempted without success to call Auble. Later, at 9:30 a.m., Villasenor was making service calls and writing in a book, when defendant approached from a nearby car, tried to see what Villasenor was writing, and said he was interested in renting an apartment. A second black person was in the car.
>
> Villasenor showed defendant apartment 29, which was vacant, and then started back to his office. Remembering Bradke's note, Villasenor instead went to apartment 26. Defendant was standing outside the window while someone else entered. The screen was off. Defendant said "manager" and "stay still." Villasenor asked who had gone through the window, but defendant denied knowing anything about it and said he was visiting someone in apartment 24. Villasenor went to the assistant manager's apartment and asked her to call 911. He heard defendant knock on apartment 26 and say, "Let's get out of here, they are calling the cops." A tall thin woman

6

with a red bandanna ran out, and she and defendant ran to a nearby car. Villasenor followed. Defendant removed the rear license plate, and then he, the woman, and a third person sped away.

Villasenor entered Auble's apartment and called the Police. Officer Robert Mongrain of the San Jose Police Department arrived. He found no usable fingerprints inside the apartment. Villasenor took Mongrain to his office to get Auble's phone number. There, a man called, asked if the police were there, and wanted Auble's phone number. Villasenor recognized defendant's voice and gave the phone to Mongrain. The caller said he and Auble were friends and could "straighten this all out." When Mongrain asked the caller to come there, the caller declined, saying he had two felonies and this would be a "third strike." The man called back later and got Auble's phone number.

Villasenor and Mongrain went to apartment 24 because Villasenor said defendant was the occupant's, Helena Newsome's, boyfriend. The door was unlocked. The screen was on the window. From there, they went to Auble's apartment. The previous caller phoned there but said he would call back later.

When Auble arrived, she said a cordless phone, a clock radio, and eight dollars in change were missing. When she left that morning the screen was on the window. Villasenor described to her the man he had seen. Auble said it was defendant, Newsome's boyfriend. Auble had seen him for a few months but had never given him permission to enter her apartment. While Mongrain was still at the apartment, the man who had called earlier called and said something to the effect that he would not do that to her. Auble became upset and hung up. He called again and identified himself to Mongrain as defendant. He denied taking part in the incident and blamed two other "guys" he met in East Palo Alto but did not know. He said he would find out and tell his parole officer.

At trial, Helena Newsome testified that she met defendant in October 1993 and had written to him while he was in Folsom prison. After his release, they became romantically involved and were presently engaged. On April 15, 1994, he was in the process of moving into her apartment. However, she had not seen him for a week because they had had an argument. She testified that defendant had been with a woman named Vicky, who was skinny and wore a bandana. Newsome said defendant was unemployed but she gave him "living money" and "gas money" and let him use her car. She said he did not have a key to her apartment on April 15 but had permission to enter through the window if necessary.

Two weeks after the burglary, police responded to a neighbor's report of a domestic disturbance at Vicky Bell's home and arrested defendant. Police learned there was a parole hold on defendant stemming from the burglary. According to Officer Mark Sole, defendant said he paid a man named Jack to drive him and Vicky

7

Bell from East Palo Alto to Newsome's apartment so he could take a shower. While Jack stayed in the car, he and Bell broke into Newsome's apartment, with permission. Defendant said that when he finished showering, Bell was gone. He heard a commotion at apartment 26. He went outside and because he was on parole told Bell to get out of that apartment. She did, and they walked to the car where Jack was waiting. He bent the rear license plate so it could not be read. Bell had a telephone and a clock radio.

### The Defense

Defendant testified and repeated what he told Officer Sole but added more detail. He said he had to shower at Newsome's because he had a job interview at Great America. When he, Jack, and Bell arrived at Newsome's apartment, Jack waited in his car. Defendant said he told a woman with a dog that he lived in the apartment and explained that his girlfriend was going in to open the door because he had left the keys inside. After entering, Bell left to get cigarettes. When she returned, defendant went outside and asked Jack to wait a bit longer because he was waiting for a call from Great America. On his way back to the apartment, defendant met Villasenor. He denied trying to see what Villasenor was writing. He asked about renting an apartment because he was not sure his plans with Newsome would work out. He explained that his mother said she would pay his rent. After Villasenor showed him an apartment, defendant returned to Newsome's apartment and made some phone calls. Bell was gone.

Defendant then heard Villasenor yelling to him about someone going into an apartment. Defendant said he did not know who it was but looked in and saw Bell, who motioned for him to be quiet. Instead, he told her to get out because the manager had seen her enter and was now calling the police. He then said, "Let's get out of there." Bell ran out to the car, and he panicked, followed her, and bent Jack's rear license plate so Villasenor could not read it. All three then drove away. He did not see stolen property in the car.

In the car, Bell asked defendant why he was worried. He had not done anything.  She said if necessary, she would testify "like I did everything." Defendant asked her to go immediately with him and tell his parole officer. They brought defendant to his mother's house, where he phoned his parole agent, Mr. Watkins.  He said someone had burglarized an apartment and he would not say who unless "push came to shove."

Defendant said that he later called Villasenor to get Auble's number to tell her about the burglary. He had Bell call Auble and say it was defendant's sister. Auble yelled and hung up on her. Defendant called back and tried to explain that he would never have burglarized her home. She said she wanted her property back, and he said he would pay for it, begged her not to press charges,

8

> and said he would be in prison for life if she did.  She hung up.  He said he later identified Jack and Bell to Officer Mongrain.
>
> Defendant explained that when he spoke to Officer Sole, he identified Jack and Bell but did not tell him everything because he has learned that saying too much "comes back on you like it's doing on me now."  He said he had asked and Bell agreed to turn herself in.
>
> Defendant admitted he fled because he did not want to be arrested and that he lied to Officer Mongrain when he told him about "two guys" whom he did not know.  He said he protected Bell because they were close.

People v. Washington, 50 Cal. App. 4th 568, 570-75 (1996).

Petitioner's evidence in support of his claim of actual innocence consists of declarations by himself, his now-wife Helena Washington (formerly Helena Newsome) and his appellate attorney, all signed in 2002, and a declaration by his trial attorney signed in 1995.  First Amended Pet. (FAP) (dkt. #8) Exs. A-D.  But unfortunately for petitioner, none of the declarations provide a trustworthy account of petitioner's innocence.  And the age of the declarations and the lack of impartiality of the declarants does not help him.  See McQuiggin, 133 S. Ct. at 1935-36 (unexplained delay in presenting new evidence bears on the credibility of evidence proffered to show actual innocence); House, 547 U.S. at 552 (testimony from witness with no evident motive to lie has more probative value than testimony from inmates, suspects, or friends or relations of the accused).

Petitioner's declaration essentially repeats his trial testimony that he and Bell entered apartment 24 through a window with Newsome's permission, and that it was Bell, not him, who later unexpectedly proceeded to burglarize apartment 26.  Dkt. #8 at 31-34.  The jury heard and rejected this testimony by its verdict.  It does not constitute "new reliable evidence," Schlup, 513 U.S. at 324, and it certainly does not "show that it is more likely than not that no reasonable juror would have convicted [petitioner] in light of the new evidence," id. at 327.

Helena Washington's declaration states that she is petitioner's wife, that she lived in apartment 24, that petitioner had her permission to enter her apartment, and that she does not believe that petitioner could have fit thru her window. Dkt. #8 at 36-37. Helena testified at trial (she was Helena Newsome then) that petitioner had her permission to enter her apartment and adds little, if anything, to her trial testimony here. Even if the declaration could be construed as new reliable evidence, it certainly does not "show that it is more likely than not that no reasonable juror would have convicted [petitioner] in light of the new evidence." Schlup, 513 U.S. at 327. After all, Helena was not a witness to the events and cannot establish that petitioner did not burglarize apartment 26 even if he had her permission to enter apartment 24.

Petitioner's appellate attorney, Michael Willemsen, states in his declaration that on September 25, 1995, Bell told him in a telephone conversation that she could help petitioner out but would not because petitioner married Helena instead of her. Dkt. #8 at 39-40. Willemsen's declaration is based on nearly 20-year-old hearsay and does not specify how Bell could have helped out petitioner. Even if it could be construed as new evidence, it is not reliable and it does not "show that it is more likely than not that no reasonable juror would have convicted [petitioner] in light of the new evidence." Schlup, 513 U.S. at 327.

Petitioner's trial attorney, Carl Beatty, states in his declaration that petitioner's mother told him that Bell told her that she committed the burglary herself and that petitioner was not responsible. Dkt. #8 at 42-44. This does not constitute new reliable evidence sufficient to show that "it is more likely than not that no reasonable juror would have convicted [petitioner] in light of the new evidence." Schlup, 513 U.S. at 327. The declaration is almost twenty years old, contains two levels of hearsay and one of the declarants is petitioner's mother.

10

In sum, none of the declarations petitioner presents as new evidence sufficiently undermine the evidence presented at trial in support of the jury's finding that petitioner burglarized apartment 26 – Bradke saw petitioner enter apartment 26, Villasenor saw petitioner standing outside the window of apartment 26 while someone else entered, petitioner had suspicious conversations with Villasenor and Auble, petitioner fled the scene and petitioner gave inconsistent statements to the authorities – to "persuade [this court] that every juror would have voted to acquit [petitioner]." Lee, 653 F.3d at 946 (citing Schlup, 513 U.S. at 327) (Kozinski, J., concurring).  Petitioner is not entitled to pass thru the actual innocence gateway and have his untimely habeas petition reviewed on the merits.

IV.

For the foregoing reasons, respondent's motion to dismiss the petition as untimely (dkt. #13) is GRANTED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: Sept 24, 2014            
                                CHARLES R. BREYER
                                United States District Judge

11